Filed 6/30/22 In re A.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E078259 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2000657) |
| v. | OPINION |
| C.M. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Michele A. Mathis, Judge. Affirmed.

Joanne D. Willis Newton, under appointment by the Court of Appeal, for Defendant and Appellant, C.M.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant, B.H.

1

Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

A juvenile court terminated the parental rights of defendants and appellants B.H. (mother) and C.M. (father) as to their son, A.M. (the child). Mother and father filed separate briefs, and both contend the court erred by finding the beneficial parental relationship exception to termination of parental rights inapplicable. (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).) They also join in each other's briefs. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On October 27, 2020, the Riverside County Department of Public Social Services (DPSS) filed a section 300 petition on behalf of the child, who was two months old at the time. The petition alleged that he came within section 300, subdivision (b) (failure to protect). The petition included allegations that mother had unresolved health issues, a substance abuse history, and a criminal history. It also alleged that she had a history with the Los Angeles and San Bernardino County's Child Protective Services and received reunification services as to four of her other children from December 2014 to November 2018; she failed to reunify with those children, her parental rights were terminated, and a permanent plan of adoption was implemented. The petition further alleged that mother and father (the parents)

_____

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise noted.

2

engaged in ongoing acts of domestic violence in the presence of the child, and that father had an extensive criminal history, including arrests and/or convictions for murder and corporal injury to a spouse.

The social worker filed a detention report and stated that on October 18, 2020, DPSS received an immediate response referral with allegations of general neglect. Mother was holding the child when father slapped mother in the face. The child was left with father while mother left the home and called law enforcement. The social worker further reported that father was currently on parole for voluntary manslaughter. The social worker reported that the child was placed in a confidential foster home on October 25, 2020.

The court held a detention hearing on October 28, 2020, and detained the child in foster care.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on November 16, 2020, and recommended that the court sustain the petition, declare the child a dependent of the court, and deny reunification services to mother pursuant to section 361.5, subdivision (b)(10) and (b)(11), and deny services to the father pursuant to section 361.5, subdivision (b)(12). She recommended that the court set a 366.26 hearing in 120 days to establish a permanent plan of adoption for the child. The social worker recommended no reunification services for mother as she failed to benefit from previous services and her parental rights were terminated as to her other children, and she continued to engage in domestic violence in the presence of the child. The social

3

worker recommended no reunification services for father, as he had an extensive criminal history, and admitted to being convicted of voluntary manslaughter and serving 12 years in prison.

The social worker filed an addendum report on December 4, 2020. She reported that there had been no consistent supervised visitation between the parents and the child. On November 15, 2020, the parents had a scheduled supervised visit, and father participated but mother was a no-show. The caregiver reported that father was very engaged and attentive to the child's needs, but the child cried through most of the visit. The caregiver reported that father became emotional and ran away, sobbing loudly and uncontrollably. On November 22, 2020, and November 29, 2020, both parents were a no-show. The social worker opined that the parents had not maintained consistent visitation with the child and, therefore, there was a minimal bond established between them and the child.

The court held a contested jurisdiction hearing on December 9, 2020. Mother was present, but the court found that father had voluntarily absented himself from the proceedings. The court sustained the petition. It noted that the recommendation was to deny services, and it granted the parents' request to bifurcate disposition.

The social worker filed another addendum report on December 22, 2020. She reported that father did not participate in three visits in December 2020, and that he had maintained minimal communication with DPSS and the child. Mother participated in visits on December 6, 2020, and December 20, 2020, but was a no-show on December 13, 2020. During the visits, the child cried most of the time, and

mother had difficulty calming him. She appeared frustrated when she could not stop him from crying and asked the caregiver for help.

On January 14, 2021, the social worker filed another addendum report and reported that on November 20, 2020, father violated his parole and a warrant was issued for his arrest due to a recent domestic violence incident with mother. He was eventually arrested on January 26, 2021. The social worker continued to report that father maintained minimal communication with the DPSS and the child. He did not participate in two additional visits since the last report. However, he did participate in a visit on January 10, 2021. Mother participated in a visit on January 10, 2021, but was a no-show on December 13, 2020, December 27, 2020, and January 3, 2021. The caregiver reported that the visits went well, and the parents interacted with the child appropriately.

The social worker filed another addendum report on February 23, 2021, and reported that at a visit on January 28, 2021, mother was engaged and played with the child, fed him, changed his diaper, and played music to calm him. Father participated in a visit on January 17, 2021, and attempted to visit on February 11, 2021, but was not allowed to while mother was visiting due to a recent domestic violence incident. He was scheduled for a supervised visit on February 17, 2021, but was a no-show. The social worker further reported that DPSS was concerned about the domestic violence between the parents and mother's failure to protect the child from harm. The social worker stated that mother had not demonstrated she could control her anger and negative behavior, and she appeared to be angry and "often vengeful in her behavior

5

toward the Department and the caregiver." DPSS was also concerned about father minimizing how his actions could have negatively contributed to the safety, emotional, and well-being of the child. Thus, the social worker recommended the child be declared a dependent, remain placed in foster care, and that the parents be denied services.

The court held a contested disposition hearing on March 3, 2021, adjudged the child a dependent, and removed him from the parents' custody. The court denied mother services pursuant to section 361.5, subdivision (b)(11), and denied father services pursuant to section 361.5, subdivision (b)(12). It also found that reunification services were not in the child's best interests. The court found the current placement appropriate and set a section 366.26 hearing.

*Section 366.26*

The social worker filed a section 366.26 report on June 21, 2021, recommending that the court set a hearing and establish a permanent plan of adoption. According to this report, the parents had been consistent with visiting the child since he was removed in October 2020, and the child "appear[ed] to recognize them." The social worker specifically reported that father had weekly supervised visits from March 2021 to June 2021 and was attentive to the child's needs. She reported that father would arrive at visits with snacks, toys, and books, that he engaged with the child appropriately, and that it was clear the child had a bond with him and enjoyed the visits. As to mother's visits, the social worker reported that mother was excited to see the child, provided him with a lot of affection, and was attentive to his needs.

6

The social worker also reported that the child had been placed in his current home for eight months and appeared to be thriving. She stated the identified prospective adoptive parent provided the child with care, supervision, and a loving family home environment. The prospective adoptive parent consistently met the child's medical, developmental, and emotional needs, and the child "recognizes the prospective adoptive parent and quickly reaches out to her." The social worker stated that the child and the prospective adoptive parent had an apparent bond with each other, and that the prospective adoptive parent expressed her desire to provide permanency for him through adoption.

The social worker filed an addendum to the section 366.26 report and stated that the child experienced distressing emotions following visits with his parents. He was transported by the prospective adoptive mother to the DPSS office, and the prospective adoptive mother reported that the child's demeanor would completely change as he entered the room, as if he knew what was going to occur. After the visits, the child would struggle with crying, or his sleep would be affected. The social worker added that "it is clear by [the child's] demeanor that he is bonded and attached to his prospective adoptive mother and to the extended family." The prospective adoptive mother was committed to adopting the child and meeting all his needs. The social worker noted that the prospective adoptive mother provided excellent care and a warm, consistent, and calm environment for the child, and that he was content with her. She noted that he "clearly leans towards the prospective adoptive mother as his primary attachment figure." The social worker reported that the prospective adoptive

mother would not be entering a post-adoption contract with the child's birth parents, since she had seen the struggles the child had after visits with his parents and believed visits would only continue to cause him anxiety and confusion as he grew older. The prospective adoptive mother was open to accepting letters and gifts from the parents and was willing to assist the child in locating them once he reached adulthood.

Mother filed a section 388 petition on October 29, 2021, and father filed a section 388 petition on November 1, 2021. Both requested reunification services.[2]

In an addendum report filed on December 17, 2021, the social worker reported that father had been difficult to work with, refused to follow any of the directives from DPSS, and acted in a threatening manner toward staff members. The social worker stated it was clear that he had not benefitted from his services as he continued to exhibit anger issues, aggressive behaviors, and outbursts.

On December 20, 2021, the court held a combined section 388/366.26 hearing. The court first heard argument from counsel concerning the section 388 petitions and denied both petitions. It then proceeded to the section 366.26 portion of the hearing. Both parents argued that the beneficial parental relationship exception to the termination of parental rights (§ 366.26, subd. (c)(1)(B)(1)) applied, each asserting that they had a bond with the child. The court stated it believed that both mother and father felt "a strong sense of bond toward the child" and acknowledged that their visitations had been appropriate. It further stated that the parents continued to be consistent with

_____

[2] Father previously filed a section 388 petition on June 15, 2021, but later withdrew it.

8

the visitations. The court then stated: "But I'd countervailingly also note that the child has been placed in its current placement for over a year at this time, since the child was approximately two and a half months old. That home and those parents are the parents that the child knows best at this time, and there is a substantial benefit to the minor in not uprooting its life as well. Now that we're at a .26, that is part of the Court's consideration." The court then concluded that the parental bond exception did not apply, stating, "So while I do believe that there are benefits to be had for maintaining a relationship with the parents, I do not believe that those benefits outweigh the benefit of permanency for such a young child who is not at this time even two years old. So I do not find that the parental bond exception does apply. While there is a benefit to the child, that is not outweighed by the benefit of permanency, and it would not be detrimental to the child to terminate parental rights. However, I will order the Department upon concluding the .26 hearing to make inquiries with the prospective adoptive parents regarding a postadoption contract and ongoing contact between the mother and/or the father with the child postadoption."

## DISCUSSION

### The Beneficial Parental Relationship Exception Did Not Apply

Both mother and father contend the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). Mother specifically claims the court erroneously considered whom the child viewed more as a parent (e.g., her or the prospective adoptive parent), and whether the prospective adoptive parent would be open to a postadoption visitation agreement. Father claims

9

the court committed reversible error when it based its finding of whether the parental beneficial relationship exception applied, in part, on the effects of uprooting the child from the prospective adoptive parent.[3]  He also joins in mother's argument that the court erred when it considered that the prospective adoptive parent might enter into a postadoption visitation agreement.  We conclude the court properly found the exception did not apply.

A. *Relevant Law*

At a section 366.26 hearing, the juvenile court selects a permanent plan for the dependent child.  (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.)  Permanent plans include adoption, guardianship, and long-term foster care.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296 (*S.B.*); § 366.26, subd. (b)(1)-(7).)  "Adoption, where possible, is the permanent plan preferred by the Legislature."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)  A permanent plan of adoption necessarily involves termination of the biological parents' parental rights to the child.  (*Id*. at p. 574.)

In selecting a permanent plan for the child, the court is first required to determine whether the child is likely to be adopted.  (See § 366.26, subd. (c)(1).)  If the court finds, based on clear and convincing evidence, that the child is likely to be

---

[3]  We note that mother and father refer to the "prospective adoptive parents" (plural) in their arguments.  When describing the child's placement, the court did state, "That home and those parents are the parents that the child knows best at this time." However, in her reports, the social worker only referred to a singular prospective adoptive parent.  Therefore, we will refer to the prospective adoptive parent in the singular form.

10

adopted, and if there has been a previous court determination, by a preponderance of the evidence, that it would be detrimental to the child to return the child to his or her parent or guardian (§§ 366.21, 366.22), then the court is required to terminate parental rights and select adoption as the child's permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under at least one of several statutory exceptions to the adoption preference. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249; § 366.26, subd. (c)(1)(B)(i)-(vi).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The parental-benefit exception applies where the court finds a "compelling reason" for determining that termination of parental rights would be detrimental to the child because, in the words of the statute, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Our Supreme Court recently clarified the proper application of the parental-benefit exception and, in doing so, discerned "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) As *Caden C.* indicates, the second and third elements of the exception are inextricably connected.

11

The *Autumn H.* court recognized this connection when it interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child *to such a degree as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, 27 Cal.App.4th at p. 575, italics added.)

We review the juvenile court's findings on the first two elements of the parental-benefit exception for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) "The determination that the parent has visited and maintained contact with the child . . . is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Ibid.*) The third element—whether termination of parental rights would be detrimental to the child—is "somewhat different" in that it requires the court to "assess[] what the child's life would be like in an adoptive home without the parent in his life." (*Id.* at p. 640.) "The court makes the assessment by weighing the harm [to the child] of losing the relationship against the benefits [to the child] of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental

12

rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

A court abuses its discretion only when it " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318.) A reviewing court should find an abuse of discretion, "only ' "if " ' " it finds that no judge could reasonably have made the decision that the judge did, when all of the evidence is viewed most favorably in support of the judge's decision. (*In re Robert L*. (1993) 21 Cal.App.4th 1057, 1067.)

B. *The Court Apparently Found That Both Mother and Father Maintained Regular Visitation and Each Had a Relationship That Would Benefit the Child*

As to the first element of the beneficial parental relationship exception, the record shows the parents did not visit the child consistently at the beginning of the dependency. However, at the section 366.26 hearing, the court found that the visitation had been consistent and appropriate. (See *Caden C.*, *supra*, 11 Cal.5th at p. 631.) Respondent acknowledges the court's finding.

As to the second element, mother asserts that the child benefitted from time with her, since she was attentive to his needs and affectionate toward him, and she was "appropriate and there were no concerns." Mother points out that she played with him on the floor, fed him, changed his diapers, read books with him, and played music to calm him. She asserts that he "appeared to recognize [her], as well." Father simply asserts the court correctly found that the parents satisfied the second element. The court stated, "I do believe that there are benefits to be had for maintaining a

13

relationship with the parents, . . ."  Respondent does not appear to dispute that the court found the child had a relationship with the parents, the continuation of which would benefit the child.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 631.)

C. *Mother and Father Failed to Establish That Termination of Parental Rights Would Be Detrimental to the Child*

Assuming the first two elements were met, the parents have still failed to establish that the termination of parental rights would be detrimental to the child. "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  The court "decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*; see *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Mother asserts the evidence showed the visits were appropriate, and she was attentive to his needs.  She states that she "was someone he recognized in his life" and simply concludes that "[t]his very young child will be harmed by eliminating Mother from his life."  Father proffers no evidence regarding this third element, but instead argues that the court erred when it considered the effects of uprooting the child from the prospective adoptive parent, as well as the postadoption contact agreement.  (See *post*, § D.)

Mother's and father's interactions with the child do not even begin to demonstrate that their relationship with him promoted his well-being "to such a degree

14

as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Neither parent has proffered any evidence to support a finding that the child had a "substantial, positive emotional attachment such that the child would be greatly harmed" if the relationship was severed. (*Ibid.*) For this reason alone, the parental benefit exception is clearly inapplicable. While the evidence showed the parents visited regularly, were attentive to his needs, played with the child, and enjoyed the visits, the social worker described the child's response to the parents as being that he "appears to recognize them." At best, mother's and father's supervised interactions with the child "amounted to little more than playdates for him with . . . loving adult[s]." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316.) Furthermore, their visits did not necessarily promote the child's well-being, but were actually detrimental at times. The evidence showed the child experienced distressing emotions following visits with the parents. The prospective adoptive mother reported that the child's demeanor would completely change as he entered the room for the visits at the DPSS office, as if he knew what was going to occur. Then after the visits, he would struggle with crying, or his sleep would be affected.

In contrast, the evidence showed the child was bonded with the prospective adoptive mother. The social worker stated that he "clearly leans towards the prospective adoptive mother as his primary attachment figure," and observed that "it is clear by [the child's] demeanor that he is bonded and attached to his prospective adoptive mother and to the extended family." As the court noted, the child was

15

approximately two months old when he was placed in the prospective adoptive home, and by the time of the section 366.26 hearing, he had lived there for over one year. The prospective adoptive mother provided excellent care and a warm, consistent, and calm environment for the child. She was committed to adopting him and to meeting all his needs.

Ultimately, mother and father failed to meet their burden of showing that the child had a substantial, emotional attachment to them such that terminating the relationship would be detrimental to him when balanced against the benefit of an adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Therefore, the court properly declined to apply the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i).

D. *The Court Did Not Commit Reversible Error*

Mother claims the court improperly focused on whether she "acted as a parent" compared to the prospective adoptive mother, whom the child viewed more as his parent. Father similarly argues that the court improperly considered the effects of uprooting the child from the prospective adoptive mother. He asserts that the court should have focused on the impact on the child of the loss of the parent-child relationship, rather than the impact on him of the loss of the relationship with the prospective adoptive mother.

In support of her argument, mother cites *In re L.A.-O.* (2021) 73 Cal.App.5th 197 (*L.A.-O.*), in which the trial court found the parental-benefit exception did not apply, partly because the parents "ha[d] not acted in a parental role in a long time" and

16

partly because the prospective adoptive parents "ha[d] been acting in a parental role." This court noted that *Caden C.* did not use the words "parental role," and because the trial court used the terminology "parental role," we could not tell whether its ruling conformed with *Caden C.* Thus, we remanded the matter for reconsideration of the parental-benefit exception. (*L.A.-O.*, at p. 202.)

Here, the court's statements should be read in context. After acknowledging the parents had visited the child consistently and appropriately, the court stated: "I'd countervailingly also note that the child has been placed in its current placement for over a year at this time, since the child was approximately two and a half months old. That home and those parents are the parents that the child knows best at this time, and there is a substantial benefit to the minor in not uprooting its life as well. . . . [¶] So while I do believe that there are benefits to be had for maintaining a relationship with the parents, I do not believe that those benefits outweigh the benefit of permanency for such a young child who is not at this time even two years old." Contrary to mother's claim, the court did not focus on whether she was "acted as a parent" compared to the caretakers, and it did not use the words "parental role," as in *L.A.-O.* Rather, the court properly assessed the parents' visitation and their relationship with the child and considered whether any harm would come from losing that relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) It further properly considered "how a prospective adoptive placement may offset and even counterbalance those harms." (*Ibid.*) Moreover, contrary to father's claim that the court erred in considering the effects of uprooting the child from the caregiver, the court properly considered whether "the

17

relationship [with him and mother] promote[d] the well-being of the child to such a degree as to *outweigh the well-being the child would gain in a permanent home with new, adoptive parents*." (*Autumn H.*, 27 Cal.App.4th at p. 575, italics added.) Although the court did note that the child was thriving with the prospective adoptive parent, the court's analysis focused on balancing the termination of the parental relationship against the benefits of permanency the child would gain in an adoptive home. This was not error.

Mother also claims that the trial court committed reversible error in relying on "a potential unenforceable [postadoption] contract with the caretakers to allow ongoing contact." Father joins in this argument. However, the court did not base its decision to terminate parental rights on the prospective adoptive parent's willingness to allow visitation post adoption. (See *S.B.*, *supra*, 164 Cal.App.4th at p. 300.) Rather, the court first found that the beneficial parental exception did not apply, and *then* it ordered the Department to "make inquiries with the prospective adoptive parent[] regarding a postadoption contract and ongoing contact" between the parents and the child. Thus, there was no reversible error.

To the extent mother and father join in each other's briefs, we also affirm the court's judgment. Accordingly, we need not address their argument that if each other's parental rights are reinstated, theirs should be as well.

18

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

19